**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, INC., FISHABLE INDIANA STREAMS FOR HOOSIERS, INC., THE HOOSIER ENVIRONMENTAL COUNCIL, INC., and PRAIRIE RIVERS NETWORK<br><br>　　　　Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of the Interior, and the U.S. FISH AND WILDLIFE SERVICE, and GARY FRAZER, in his official capacity as Assistant Director of the U.S. Fish and Wildlife Service,<br><br>　　　　Defendants. | **DECLARATION OF GARY FRAZER**<br><br>Case No. 1:20-CV-01227-JLA |

I, Gary Frazer, state the following:

1. I am the Assistant Director ("AD") for Ecological Services of the U.S. Fish and Wildlife Service ("Service"), an agency of the U.S. Department of the Interior ("Department"), located in Washington, D.C. In my capacity as AD, I am responsible to the Director of the Service and to the Secretary of the Department for, among other things, the administration of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, including determinations about whether species should be listed as threatened or endangered under the ESA and designations of critical habitat for ESA-listed species.

2. In my capacity as AD, I oversee ESA listing and critical habitat workload planning and execution, which includes related budget allocation decisions. I also review species petition findings, listing determinations, and critical habitat designations as they pass through the Service's Headquarters for final decision, and I participate in Departmental briefings on the regulatory packages for clearance to publish in the *Federal Register*.

3. I submit this declaration in support of Defendants' position in this matter that an appropriate deadline for completion of the 12-month finding for lake sturgeon and submission to the *Federal Register* is June 30, 2024.

**The Service's Listing Workload and Budget**

*Budget*

4. For over a decade, Congress has included in the appropriations for the Service's resource management budget a spending cap on the amount the Service could spend on petition findings, listing determinations, and designations of critical habitat (the "listing budget").

5. For the previous five FYs, the annual spending caps for listing and critical habitat were: $20,515,000 for FY 2015; $20,515,000 for FY 2016; $20,476,000 for FY 2017; $18,818,000 for FY 2018; and $18,318,000 for FY 2019.

6. On December 20, 2019, the appropriations bill for FY 2020 became law. It included a spending cap of $20,318,000 for the listing budget. Pub. L. No. 116-94. While this cap was an increase from the previous two FYs, it was still a decrease over the levels Congress established in FYs 2015-2017 when we created and released our National Listing Workplan (explained further below).

7. The Department of the Interior's FY 2021 budget has not been finalized and we do not yet know what Congress will appropriate for FY 2021, nor for future FYs, but the final appropriation will determine our ability to work on listing decisions and critical habitat determinations, including the lake sturgeon finding.

8. Given the spending cap, the Service's listing budget is limited, which in turn limits the number of actions we can fund in a fiscal year. *See* 31 U.S.C. § 1341(a)(1)(A).

9. When the funds are made available to the Service, we allocate some of them for Headquarters functions that support the national listing program. Then, we allocate funds to our regional offices based on a standardized process we have developed to determine the resource needs for implementing the National Listing Workplan ("Workplan") for FYs

2017-2023. Under that process, we allocate funding to the eight Regions[1] based on several factors. First, we provide the salary funding required to pay for all Regional staff for the time they spend working on listing packages. Second, we determine the percentage of the national workload for which the Region has the lead by calculating the regional workload percentage—a rolling 3-year average of the total number of "new starts" (largely 12-month petition findings, as well as some proposed listing rules and discretionary status reviews) for which each Region is responsible. Third, we take into consideration other factors, such as the complexity of the packages assigned to that Region. Thus, each Region receives a portion of listing funds based on that Region's percentage of workload relative to the national total.

10. Based on this process, the Service's Region 3 (Midwest Region), which is the lead Region for the lake sturgeon finding, was allocated $805,139 for staffing and for package costs in FY 2020.

*Workload*

11. Between 2007-2010, the Service received petitions to list 1,187 species. In 2009-2010, WildEarth Guardians and the Center for Biological Diversity filed 20 deadline lawsuits between them, covering nearly 800 listing deadlines. Ultimately, these cases were consolidated by the Judicial Panel on Multi-District Litigation ("MDL") and settled in two separate agreements—one with each plaintiff. In the agreements, the Service committed to make various findings for hundreds of species, including making listing determinations for 251 candidate species, over a six-year period.[2]

12. As a result of the MDL agreements, the Service completed many findings and rules in FYs 2012-2017. The MDL agreements were a precursor to our comprehensive National

---

[1] In the past year, the Department consolidated its Regional boundaries across bureaus, which changed the number of Service Regions from 8 to 12. However, our financial systems are transitioning to that new organizational structure, so for FY21 the Service will still allocate funding, including funding from the listing budget, to the 8 former Regions.
[2] *See In re: Endangered Species Act Section 4 Deadline Litigation*, No. 10-mc-00377-EGS (D.D.C.), Documents 31-1 (May 10, 2011) and 42-1 (July 12, 2011).

3

Listing Workplan that prioritizes our workload based on the needs of candidate and petitioned species, while providing greater clarity and predictability about the timing of listing determinations.

13. During 2015-2016, we undertook comprehensive workload planning for our domestic listing activities to ensure that our limited listing funding would be directed to the highest-priority actions. Our goals in this effort were to be strategic in addressing pending status reviews and transparent in how we establish workload priorities, as well as to collaborate with stakeholders more effectively to conserve the nation's most imperiled species.

14. As part of this undertaking, we developed and published for notice and comment a new Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings on Petitions for Listing under the Endangered Species Act, 81 Fed. Reg. 49248 (July 27, 2016) ("Prioritization Methodology"). The Prioritization Methodology explains how we prioritize outstanding 12-month listing petition findings, and it informed the development of our first multi-year Workplan and subsequent Workplan updates. Specifically, we used the Prioritization Methodology to prioritize the 12-month findings on the Workplan by placing them in one of five priority category "bins" that reflect our view of the species' conservation status, how much information we have on the species and whether new science is being developed, and whether there are currently conservation efforts underway.

15. Under the methodology, we assign each 12-month finding to one of five priority bins: (1) The species is critically imperiled; (2) strong data are already available about the status of the species; (3) new science is underway that would inform key uncertainties about the status of the species; (4) conservation efforts are in development or underway and likely to affect the status of the species; or (5) the available data on the species are limited. As a general rule, within each region, 12-month findings with a lower bin number have a higher priority than, and are scheduled before, 12-month findings with a higher bin number. However, we make some limited exceptions—for example, we may schedule a

lower-priority finding earlier if batching it with a higher-priority finding would generate efficiencies.

16. One objective in developing and implementing the Workplan is to balance our yearly workload between the various types of listing and critical habitat actions, including 90-day petition findings, 12-month petition findings, proposed and final listing determinations, and proposed and final critical habitat designations. We try to strike this balance so that species most in need of protection can receive it in a timely manner. Prioritizing petition findings, for example, over other ESA workload priorities would delay or altogether prevent us from completing the work needed to issue proposed and final listing rules for species determined to warrant listing, including species on our candidate list.

17. The current Workplan, issued in May 2019, is available on our website[3] and states our planned workload for FYs 2019-2023. The vast majority of the actions are 12-month petition findings (about 223 findings), but it also includes listing determinations for 15 candidate species already determined to warrant listing. The Workplan materials also describe that we will, in most cases, simultaneously propose listing and critical habitat when we make a warranted determination in a 12-month petition finding. The Workplan also includes status reviews and rules that the Service has decided to undertake on our own initiative based on input from the agency's scientists without having received a petition; in some cases, these non-petitioned species are included in the Workplan as a way of further leveraging our limited resources by batching them with similar or co-occurring species for which we have been petitioned. The Workplan does not include timelines for all actions that contribute to our total workload. For instance, if the Workplan schedules a 12-month finding on a petition to list a particular species, it does not pre-judge the outcome of the petition finding and include a date for the future publications that

---

[3] https://www.fws.gov/endangered/esa-library/pdf/5-Year%20Listing%20Workplan%20May%20Version.pdf

would be necessary if the 12-month petition finding concludes that listing is warranted. In this example, should we concurrently propose listing and critical habitat rules as part of the warranted 12-month petition finding, we would also need to make a final listing determination and final critical habitat designation, but these actions would not be included on the Workplan. For new petitions received subsequent to the Workplan's publication, our goal (which is shared with the public on our website) is to schedule Bin 1 species into the Workplan as soon as possible and incorporate species in Bins 2-5 into the Workplan according to their bin number if feasible, or to otherwise add those species to the end of the Workplan.

18. Prioritizing petition findings over other ESA workload priorities would delay or altogether prevent us from completing the work needed to issue proposed and final listing rules for species determined to warrant listing, including species on our candidate list. We update the Workplan periodically to reflect our consideration of new petitions and new information over time. We also post more detailed Workplans each FY that provide a more current view of the actions that the domestic listing program plans to complete in that FY after we determine which 12-month findings from the previous year were warranted, so that the Workplan can incorporate any increases in the overall work of the listing program in the form of final listing and critical habitat rules.

19. As part of the process for updating the Workplan, we reprioritize actions as we receive new petitions and new information on existing petitions that indicate those actions should be re-binned according to the Prioritization Methodology. This reprioritization informs the order in which actions appear on the Workplan and the order in which regional and field offices work on the actions assigned to them.

20. From May 14, 2018, (the date of Plaintiffs' petition) through September 15, 2020, the Service completed the following actions: 53 not-warranted 12-month listing petition findings, 7 proposed listing and critical habitat rules, 15 proposed critical habitat designations, one final listing and critical habitat rule, 6 final listing determinations, 7 final critical habitat rules, and one not-prudent critical habitat determination.

6

21. Region 3 currently has eleven 12-month findings, one discretionary status review, and one court-remanded action scheduled for FY 2021-2023. While not all of these actions appear on the current Workplan, they will be reflected on our next Workplan update planned for this fall. If listing as threatened or endangered is found to be warranted for any of those species that Region 3 is currently reviewing, we would typically simultaneously issue a proposed listing rule as well as a proposed critical habitat rule if we find that critical habitat is prudent and determinable. For those species that we propose to list as threatened species, additional work is involved because the Service will simultaneously propose a species-specific Section 4(d) rule to establish any necessary protections for the species. Also, typically within one year of the proposals, we would issue final listing rules, final critical habitat rules, and final 4(d) rules if we find that all of those actions are appropriate. Finalizing those rules necessarily involves substantial additional effort.

22. Region 3's workload currently includes four stand-alone critical habitat designations and three final listing and critical habitat rules. This current workload does not include the work that is needed to respond to new listing petitions for Region 3-lead species that are likely to be received in the near future. For those petitions, we would schedule 90-day findings, and, as we find that any of those petitions present substantial information indicating that the petitioned action is warranted, we would schedule subsequent 12-month findings in accordance with their "bins" under the Prioritization Methodology.

23. For the Service as a whole, the May 2019 Workplan includes 150 12-month findings and 10 proposed listing rules / proposed critical habitat rules for FYs 2021-2023. Region 3's allocation of this Workplan workload aligns with the staff and resources available to accomplish it. While other Regions may have more staff and resources, those Regions are tasked with other listing program and Workplan priorities that align with their staffing, meaning that they have a larger share of the workload. As such, any shifting of listing work among the Regions triggers a cascading series of consequences that ultimately can disrupt the careful balance of Workplan priorities compared to Service resources to accomplish those priorities. In short, shifting work from Region 3 to Region 1, for

example, has the very likely result of causing one or more Region 1 projects to fall behind. For this reason, we rarely reassign one Region's listing work to another Region. The lake sturgeon does not appear on the May 2019 5-year Workplan because we made a positive 90-day finding (meaning that we found that "the petition presented substantial scientific or commercial information indicating that" listing the lake sturgeon "may be warranted") on August 15, 2019. However, we have incorporated the 12-month finding into our internal work planning and, consistent with the Prioritization Methodology, have placed the lake sturgeon in "Bin 4" (the bin that is assigned to species for which conservation efforts are in development or are underway); this reflects our reasoned judgment on the priority of determining the status of the lake sturgeon relative to other species on the Workplan.

24. After assigning lake sturgeon a "Bin 4" priority, and considering the complexity of the finding given the species' wide range (18 states) and the need to coordinate among multiple Regions, we identified FY 2025 as our target completion date for the 12-month finding. Assessing the status of a species requires Service personnel to coordinate with States and other partners to obtain the best available information across the species' range, evaluate the current and future condition of the species, and draft a scientifically rigorous document to inform a 12-month finding. However, in a good-faith effort to accommodate Plaintiffs' concerns, we have revisited the Region's other scheduled species in Bin 4 and can adjust resources to complete the lake sturgeon finding in FY 2024 instead of FY 2025. An earlier commitment is not possible due to the fact that the 12-month findings scheduled for FYs 2021-2023 are largely Bin 3 findings, which are a higher priority than Bin 4 species. There are only two exceptions. The first exception to limiting the 2021-2023 workload to Bin 3 findings is the monarch butterfly, which we must submit to the *Federal Register* in FY 2021 pursuant to a court-approved settlement agreement (*Ctr. for Food Safety v. Bernhardt*, No. 1:16-cv-1008-EGS (D.D.C.), May 24, 2019 (Minute Order). The second exception to limiting the 2021-2023 workload to Bin 3 findings is three bat species that are grouped together because they are all affected by white-nose syndrome; one of

these three bat species is the northern long-eared bat, which the District Court for the District of Columbia has remanded to the Service (*Ctr. for Biological Diversity v. Skipwith*, No. 1:15-cv-477-EGS (D.D.C.), Document 21 (Jan. 28, 2020)). The plaintiffs in the northern long-eared bat case intend to file a motion for remedy on October 2, 2020, seeking a date certain for the Service to submit new proposed and final rules for listing the northern long-eared bat as a threatened or endangered species. To avoid placing the lake sturgeon—a Bin 4 species—before the species that are in Bin 3 and thus have a higher priority, we have scheduled the 12-month finding for the lake sturgeon for completion in FY 2024 and expect to send the 12-month finding to the *Federal Register* on or before June 30, 2024. In the meantime, as the Assistant Regional Director's declaration explains, conservation efforts for the lake sturgeon are ongoing and being further developed. Furthermore, that declaration also explains that Region 3 is currently working on other, higher-priority actions to which we have already allocated our limited resources. Requiring us to complete the lake sturgeon finding earlier would require that we shift our priorities and resources, to the detriment of other species that are in greater need of conservation.

This declaration is made under the provision of 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge, information, and belief.

Executed in Washington, D.C., on this _1st___ day of October 2020.

_____
Gary Frazer
U.S. Fish and Wildlife Service