UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, INC., FISHABLE INDIANA STREAMS FOR HOOSIERS, INC., THE HOOSIER ENVIRONMENTAL COUNCIL, INC., and PRAIRIE RIVERS NETWORK<br><br>    Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of the Interior, and the U.S. FISH AND WILDLIFE SERVICE, and GARY FRAZER, in his official capacity as Assistant Director of the U.S. Fish and Wildlife Service,<br><br>    Defendants. | **DECLARATION OF LORI NORDSTROM**<br><br>Case No. 1:20-CV-01227-JLA |

I, Lori Nordstrom, state the following:

1. I am employed by the United States Fish and Wildlife Service ("Service") as the Assistant Regional Director for the United States Department of the Interior Region 3 ("IR3") Ecological Services in Bloomington, Minnesota. In my capacity as Assistant Regional Director, I am responsible to the Regional Director of the Great Lakes Region, Director of the Service, and to the Secretary of the Interior for the administration of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531-1544, including recommendations about whether species should be listed as threatened or endangered, and designations of critical habitat.

2. IR3 Ecological Services is the lead office within the Service for the lake sturgeon (*Acipenser fulvescens*) 12-month finding. I am familiar with the petition to list the species

1

and the Service's 90-day finding on the petition, which published on August 15, 2019 (84 Fed. Reg. 41691). In this declaration, I will: (1) describe the conservation efforts underway for the lake sturgeon; (2) outline the actions that must be completed for the Species Status Assessment ("SSA") and 12-month finding, and if warranted, a proposed listing rule with proposed critical habitat; and (3) provide an overview of the IR3 listing program's workload that affects the Service's timeline for completing the lake sturgeon finding.

**Background on the Lake Sturgeon**

3. On May 23, 2018, the Service received the Center for Biological Diversity's petition to list the lake sturgeon, and on August 15, 2019, we published a 90-day finding that the petition presented substantial information indicating that listing may be warranted (84 Fed. Reg. 41691). As explained in the Assistant Director's declaration, the Service intends to complete a 12-month finding on the lake sturgeon in Fiscal Year ("FY") 2024. The Service developed this timeline by implementing its Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings on Petitions for Listing under the Endangered Species Act ("Prioritization Methodology") (81 Fed. Reg. 49248 (July 27, 2016)). The Prioritization Methodology established five priority "bins" for outstanding 12-month petition findings: (1) critically imperiled species; (2) species for which strong data on the species is already available; (3) species for which new science is underway to inform key uncertainties; (4) species for which conservation efforts are already in development or underway; and (5) species for which limited data is currently available (81 Fed. Reg. at 49249-50). We placed the lake sturgeon in "Bin 4" because conservation efforts for the species are underway and are likely to address the threats to the species in the interim.

4. The lake sturgeon is a freshwater fish that inhabits large river and lake systems in the Great Lakes, St. Lawrence, Hudson Bay, and Mississippi River basins in Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, New York, North

Dakota, Ohio, Pennsylvania, Tennessee, Vermont, and Wisconsin; and Coosa River in Alabama and Georgia. Potential threats to the lake sturgeon include dams and hydroelectric facilities, dredging and channelization, contaminants, habitat fragmentation, and invasive species.

5. The Service's Fisheries program has been implementing conservation actions for lake sturgeon for many years. In IR3, the Fisheries program works with the States, Great Lakes Fisheries Commission, Canada, and regional fish commissions to help manage, conserve, restore, and protect lake sturgeon populations. IR3's Fish and Wildlife Conservation Offices ("FWCO") tag and monitor lake sturgeon and gather needed information on population status and trends. In the Northeast, the Service's Lower Great Lakes FWCO is tracking lake sturgeon in the lower Niagara River. The FWCOs also implement aquatic habitat restoration and remove barriers to fish passage. In addition, the Service provides assistance to Native American tribes with lake sturgeon restoration activities. Genoa National Fish Hatchery in Wisconsin has been rearing lake sturgeon since 1993. The hatchery currently raises lake sturgeon for ongoing restoration efforts and assists eight states and three Midwestern tribes to restore lake sturgeon to their waters. The Service's Warm Springs National Fish Hatchery in Georgia has been rearing lake sturgeon since 2000 for reintroduction efforts in Tennessee and Georgia.

**Species Status Assessment and 12-Month Finding**

6. A determination regarding the lake sturgeon is considered a "new start" for the Service, in that it will be the first determination of whether the species is endangered or threatened. In order to complete a 12-month finding for a "new start" species, IR3 Ecological Services must first complete a Species Status Assessment. The SSA framework is an analytical approach developed by the Service to deliver foundational science for informing all ESA decisions. An SSA is a focused, repeatable, and rigorous scientific assessment. The SSA approach aids decision-makers in producing better assessments, improved and more-transparent and defensible decisions, and clearer and more-concise documents. We are

3

already seeing the benefits of this approach, and we anticipate that those benefits will increase as the Service fully transitions to the SSA framework approach.

7. Ideally, the SSA is conducted at or prior to the candidate assessment or 12-month finding stage, but can be initiated at any time. The SSA is designed to "follow the species" in the sense that the information on the biological status is available for conservation use and can be updated with new information. Thus, the SSA provides a single source for species' biological information needed for all ESA decisions (e.g., listing, consultations, grant allocations, permitting, HCPs, and recovery planning). The biological analysis and the resulting stand-alone science-focused assessment allow for State and partner engagement in the science upon which the Service bases its ESA decisions. And even in advance of potential ESA decisions, early identification of what most influences the species' condition affords timely opportunities to work with partners to implement conservation efforts designed to improve the status of the species.

8. An SSA begins with a compilation of the best available information on the species (taxonomy, life history, and habitat) and its ecological needs at the individual, population, and/or species levels based on how environmental factors are understood to act on the species and its habitat. Next, an SSA describes the current condition of the species' habitat and demographics, and the probable explanations for past and ongoing changes in abundance and distribution within the species' ecological settings (i.e., areas representative of geographic, genetic, or life history variation across the range of the species). Lastly, an SSA forecasts the species' response to probable future scenarios of environmental conditions and conservation efforts. Overall, an SSA uses the conservation biology principles of resiliency, redundancy, and representation (collectively known as the "3Rs") as a lens to evaluate the current and future condition of the species. As a result, the SSA characterizes a species' ability to sustain populations in the wild over time based on the best scientific understanding of current and future abundance and distribution within the species' ecological settings.

9. An SSA is, in essence, a biological risk assessment to aid decision-makers who must use the best available scientific information to make policy decisions. The SSA provides decision-makers with a scientifically rigorous characterization of species status that focuses on the likelihood that the species will sustain populations within its ecological settings along with key uncertainties in that characterization. The SSA does not result in a decision directly, but it provides the best available scientific information, and the Service then evaluates that information in light of the policy standards that guide ESA decisions.

10. The ESA broadly defines "species" as "any subspecies of fish or wildlife or plants and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). As an alternative to listing the lake sturgeon range-wide, the petitioners also requested that we define and list distinct population segments as endangered or threatened and suggested at least nine potential population segments to consider and evaluate. To interpret and implement the Distinct Population Segment ("DPS") provisions of the Act, the Service and National Marine Fisheries Service published the Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act (61 FR 4722). Under the DPS Policy, three elements are considered in the decision regarding the establishment and classification of a population of a vertebrate species as a possible DPS: (1) the discreteness of a population segment in relation to the remainder of the species to which it belongs; (2) the significance of the population segment to the species to which it belongs; and (3) the population segment's conservation status in relation to the Act's standards for listing, delisting, or reclassification. The SSA will also need to conduct analyses to inform and provide the scientific basis for these decisions under the DPS policy.

11. Development of an SSA normally takes at least 12 months. Due to the lake sturgeon's wide range and ongoing conservation efforts across 18 states, multiple tribes, multiple Service Regions and programs, and Canada, the work required to document and compile the data, conduct the SSA analyses for the species as well as potential DPSs, and coordinate among the multiple States, Tribes, Service Regions and programs, and

5

Canadian agencies will be complex and time-consuming. We anticipate completion of the SSA will take longer than 12 months.

12. The SSA report is used as the biological basis for the Recommendation Team Meeting, in which the Ecological Services managers from all of the Regions within the species' range meet to review the status of the species (including potential DPSs) currently and into the future and determine if that status meets the definition of a threatened or endangered species. Next, members of the recommendation team brief decision-makers in the Service on their recommendation. If the recommendation is that listing of the lake sturgeon is warranted, then staff would typically draft an appropriate *Federal Register* notice, including, if appropriate, the text of the proposed listing rule, based on the information in the SSA report, for the review and clearance process. At this point, the Service would need to consider a critical habitat determination and designation, if prudent and determinable. If the recommendation is that the lake sturgeon meets the definition of a threatened species, then staff would, if appropriate, also draft a species-specific section 4(d) rule simultaneously with the proposed listing rule. If the recommendation is that listing of the lake sturgeon is not warranted, staff will then draft an appropriate *Federal Register* notice for the review and clearance process.

13. Critical habitat must be designated concurrently with a listing determination "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A). Our regulations at 50 C.F.R. § 424.12 explain our interpretation of "prudent" and "determinable." We consider critical habitat to be not determinable if we do not have sufficient information to assess the impact of the designation, or if we do not have sufficient biological information on the species' needs, at the time that we make a listing determination.

14. Because we do not yet know whether listing the lake sturgeon will be recommended, we do not know if we will need to work on a critical habitat rule. If so, we will follow the process outlined below.

**Designation of Critical Habitat**

15. The ESA provides that the Service may designate specific areas as critical habitat that are occupied at the time of listing and that have "physical and biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection" 16 U.S.C. § 1532(5)(A).

16. The ESA also provides that we may designate areas that are unoccupied at the time of listing if we determine that the "areas are essential for the conservation of the species." *Id.*

17. We must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying such area as part of the critical habitat." 16 U.S.C. § 1533(b)(2).

18. We publish proposed critical habitat rules in the *Federal Register*, as the ESA requires. 16 U.S.C. § 1533(b)(5)(A). It also requires that we publish final critical habitat rules at the time of publishing final listing rules, unless at that time critical habitat is not determinable, in which case we may extend the time by one year. 16 U.S.C. §§ 1533 (b)(6)(A)(ii), (b)(6)(C).

19. The ESA allows us to exclude specific areas from critical habitat designations "if the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . failure to designate . . . will result in extinction." *Id.* In practice, existing conservation agreements, tribal equities, economic impacts, and national security are all factors we consider in an exclusion analysis, as well as the conservation value of the area (*see* Policy Regarding Implementation of Section 4(b)(2) of the Endangered Species Act, 81 FR 7226 (Feb. 11, 2016) (4(b)(2) Policy)).

**Process for Designating Critical Habitat**

20. Designating critical habitat, when it is found to be prudent and determinable, involves many steps, some of which are science-based and some of which are policy-based. The following paragraphs provide a broad outline of these steps. Generally, it is our goal to

propose critical habitat rules with proposed listing rules and to finalize them concurrently with the final listing.

21. To begin a critical habitat designation a team of staff biologists considers the conservation needs of the species and identifies physical and biological features that may require special management considerations or protection and that are essential for the conservation of the species. Then the team looks for areas that contain the physical and biological features and that were occupied by the species at the time of listing in light of the species' conservation needs. It also considers unoccupied areas that are essential for the conservation of the species.

22. Once the team has identified areas that meet the definition of critical habitat, it also must follow the direction in the statute to consider economic impacts and other relevant impacts of the designation. For the economic analysis, we prepare an incremental effects memorandum, which describes the anticipated effects of the designation, informed by the information we have gathered from other federal agencies whose actions may affect critical habitat and be subject to consultation. This information is provided to an economics contractor who produces an analysis of the economic impact of the critical habitat designation on local jurisdictions, landowners, and the local economy because of the designation. The economic analysis only identifies and analyzes impacts over and above the economic impacts of the listing, i.e., the "incremental" impacts, anticipated to be incurred as a result of the designation. The contractor generally provides the economic analysis within 6 weeks after receiving all necessary information from us.

23. The team may identify any specific areas that should be considered for exclusion from the designation based on economic, national security, or other relevant impacts. Our standard practice is to conduct the analysis of economic or other impacts on the designation as proposed, then to remove from the final critical habitat designation any specific areas if we determine that the benefits of exclusion outweigh the benefits of inclusion and that exclusion will not lead to the extinction of the species.

**Review and Clearance Process**

24. Once the appropriate notice for the 12-month finding is drafted, the draft notice moves through regional review from the staff level to the Regional Director, as well as legal review by an attorney in the Regional Solicitor's office. It then goes to Headquarters for review by the Branch Chief for Domestic Listing and the Chief of the Division of Conservation and Classification. Next, the Assistant Director for Ecological Services reviews and surnames before transmitting the notice to the Service Director, who has signature authority for ESA determinations for final decision.

25. Following the Service Director's signature, the notice will move to the Assistant Secretary for Fish and Wildlife and Parks and, finally, to the Executive Secretary for final clearance to send the document to the *Federal Register*. At any point in the policy review stage, policy-level reviewers may seek input from other officials or ask questions of staff regarding the package.

26. The minimum time for policy review from the time a notice arrives in Headquarters to the time the notice is cleared for publication is three months. The team must take this into account when working on the notice and must also allow time for briefing regional leadership and senior policy officials. During this time, too, if a critical habitat designation is proposed, the economic analysis must proceed and be completed so that the information can inform public review of the proposed rule.

27. Several days typically elapse between submission of a notice to the *Federal Register* and actual publication. We cannot control when the Office of the Federal Register will schedule a submission for publication, and so we ask that if this Court assigns a deadline to these actions, that it order us to submit the findings to the *Federal Register,* rather than to publish the 12-month finding, by a date certain.

**IR3 Ecological Service's Workload Related to the Lake Sturgeon**

28. In addition to the SSA and 12-month finding for the lake sturgeon, IR3 Ecological Service's listing responsibilities include eleven 12-month findings, one discretionary

9

status review, and one court-remanded action, scheduled for FY 2021-2023 on the Service's National Listing Workplan[1]. All of these species will require coordination across multiple states and Service regions, and some will require obtaining data from other countries. These actions are mostly for species assigned to Bin 3, which are higher priority than Bin 4. The two exceptions are the monarch butterfly and the little brown bat. The Service must deliver a 12-month finding for the monarch butterfly to the *Federal Register* by December 15, 2020, pursuant to a court-ordered settlement agreement (*Ctr. for Food Safety v. Bernhardt*, No. 1:16-cv-1008-EGS (D.D.C.), May 24, 2019 (Minute Order). As for the little brown bat, the Service is grouping the bat with listing decisions for other bat species, including the northern long-eared bat. The northern long-eared bat listing rule has been remanded to the Service by the U.S. District Court for the District of Columbia, *Ctr. for Biological Diversity v. Skipwith*, No. 1:15-cv-477-EGS (D.D.C.), Document 21 (Jan. 28, 2020), and the plaintiffs in that case intend to file a motion for remedy on October 2, 2020, seeking a date certain for the Service to submit new proposed and final rules for listing the northern long-eared bat. IR3's workload also currently includes four stand-alone critical habitat designations and three final listing and critical habitat rules.

29. Based on the Service's workload on higher priority listing actions and the level of time and effort necessary to complete the SSA, we believe we can submit the 12-month finding on the petition to list the lake sturgeon to the *Federal Register* by June 30, 2024.

This declaration is made under the provision of 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge, information, and belief.

---

[1] https://www.fws.gov/endangered/esa-library/pdf/5-Year%20Listing%20Workplan%20May%20Version.pdf

Executed in Bloomington, Minnesota, on this \_\_\_\_ day of September 2020.

_____

Lori Nordstrom

U.S. Fish and Wildlife Service