**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CENTER FOR BIOLOGICAL** | ) | |
| **DIVERSITY, INC., et al.,** | ) | |
| | ) | **No. 20 C 1227** |
| **Plaintiffs,** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **v.** | ) | |
| | ) | |
| **DEB HAALAND, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## Memorandum Opinion and Order

The present dispute centers around Plaintiffs' petition to the U.S. Fish and Wildlife Service (hereafter the "Service") to list the lake sturgeon as a threatened or endangered species under 16 U.S.C. §1533. The parties agree that the Service has not complied with 16 U.S.C. §1533(b)(3), which requires the Secretary of the Interior (hereafter "Secretary") to issue a finding related to an interested person's petition within 12 months of receiving the petition.

Before the Court are the parties' cross motions for summary judgment. *See* [22], [24]. Plaintiffs request an order compelling the Defendants to issue its 12-month finding within twelve months of this Court's order. Defendants contend that Plaintiffs' proposed deadline is unfeasible considering current and anticipated budgetary constraints, overall workload, and current listing priorities. Defendants propose a deadline of June 30, 2024. For the reasons set forth below, the Court grants Plaintiffs' motion as to liability, but adopts Defendants' proposed deadline of June 30, 2024.

# Background

The following facts are undisputed unless otherwise noted. The Court addresses the pertinent facts of this case before turning to the legal background under the Endangered Species Act, 16 U.S.C. §1531, *et. seq.* (hereafter "ESA"), required to understand this dispute.

## I.  Factual Background

### A.  The Parties

Plaintiffs comprise a collective of non-profit organizations dedicated to conservation, preservation, and environmental advocacy causes. When Plaintiffs filed this lawsuit, David Bernhardt was the Secretary of the Interior and was sued in his official capacity.[1] Similarly, Gary Frazer was the Assistant Director of the U.S. Fish and Wildlife Service and sued in his official capacity.[2] The Secretary of the Interior delegated administration of the ESA to the U.S. Fish and Wildlife Service. [22-2 at ¶15]; 50 C.F.R. §402.01(b).

### B.  Plaintiff's Petition

On May 23, 2018, the Service received Plaintiffs' petition, submitted under 16 U.S.C. §1533, asking the Service to protect the lake sturgeon as a threatened species or, in the alternative, to identify and list specific segments of the lake sturgeon as endangered or threatened. The lake sturgeon is a large, long-lived, freshwater fish species that historically inhabited rivers and lakes through the Hudson Bay, the Great Lakes basin, and the Mississippi

---

[1] Deb Haaland, the current Secretary of the Interior, will be automatically substituted under Rule 25(d) of the Federal Rules of Civil Procedure. *See* Press Release, Secretary Haaland Hits the Ground Running on Day One at the Department of the Interior (March 17, 2021) (https://www.doi.gov/news/secretary-haaland-hits-ground-running-day-one-department-interior).

[2] Martha Williams replaced Gary Frazer and is currently the Principal Deputy Director of the U.S. Fish and Wildlife Service. *See* Press Release, Interior Department Announces Members of Biden-Harris Leadership Team (Jan. 20, 2021) (https://www.doi.gov/pressreleases/interior-department-announces-members-biden-harris-leadership-team). Ms. Williams will be substituted, in her official capacity, in place of Gary Frazer per Rule 25(d).

River drainage. Staff at the Center for Biological Diversity (one of the Plaintiffs) worked on the petition for three years, consulting with dozens of researchers and agency fisheries biologists and reviewing more than 500 scientific papers and agency reports. The petition concurrently requested the Service designate critical habitats for the lake sturgeon under 16 U.S.C. §1533.

The Service published its 90-day finding, as required under the ESA, on Plaintiffs' petition on August 15, 2019. To date, the Service has not made the requisite 12-month finding, also required by the ESA. On December 12, 2019, the Service received Plaintiffs' sixty-day notice of intent to sue for failing to make a 12-month finding, in accordance with 16 U.S.C. §1540(g)(2)(C). Plaintiffs then initiated this lawsuit to compel the Service to issue a 12-month finding on their petition.[3]

## II. Legal Background

The Endangered Species Act (hereafter "ESA") serves to protect endangered and threatened species and their ecosystems. 16 U.S.C. §1531(b). To facilitate this purpose, the ESA directs the Service (through its direction to the Secretary) to determine whether a particular species should be listed as "threatened" or "endangered." 16 U.S.C §1533. The Service can make its threatened or endangered determination voluntarily or in response to a petition from an interested person in accordance with 5 U.S.C. §553(e). 16 U.S.C. §1533(b). The Service must make its determination using the best scientific and commercial data available to it and after conducting a review of the species' status that accounts for those efforts, if any, being made by any State or foreign nation. *Id.*

---

[3] Defendants do not respond to Plaintiffs' assertion that they have standing to bring this claim. In any event, the Court finds that Plaintiffs have standing because their members have standing to sue on their own, the interests at stake are germane to the Plaintiffs' organizational purpose, and the claims presented do not require the participation of an individual. *See Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862-63 (7th Cir. 1996).

### A. Petitions by Interested Persons

An interested person may petition the Service to list a species as threatened or endangered. 16 U.S.C. §1533(b)(3). The petition process plays out in three stages:

1. <u>The 90-Day Finding.</u> The Service receives a petition and then has 90 days to make a finding "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted[.]" If the Service makes this finding, then it must commence a review of the concerned species. 16 U.S.C. §1533(b)(3)(A).

2. <u>The 12-Month Finding.</u> If the 90-day finding presents substantial scientific or commercial information indicating that the petitioned action may be warranted, the Service must make a finding within 12-months as to whether the petitioned action is: (1) warranted; (2) not warranted; or (3) warranted but precluded. A "warranted but precluded" finding means that listing is warranted but is precluded by other higher-priority listing actions. A warranted but precluded finding must still be accompanied by a description and evaluation of the reasons and data on which the finding is based. The Service refers to species whose listing have been found "warranted but precluded" as "candidate species." 16 U.S.C. §1533(b)(3)(B).

3. <u>The Final Listing Determination.</u> For species that the Service determines warrant protection, the Service must publish a rule proposing the species' listing as endangered or threatened. 16 U.S.C. §1533(b)(3)(B)(ii); 16 U.S.C. §1533(c).

Furthermore, 16 U.S.C. §1540(g) authorizes a civil suit by a person "where there is alleged a failure of the Secretary [of the Interior] to perform any act or duty under [16 U.S.C. §1533][] which is not discretionary with the Secretary." This includes an injunctive action to force the Secretary to comply with the above deadlines. *See, e.g.*, *Ctr. For Biological Diversity v. U.S. Fish and Wildlife Service*, Case No. 19-cv-354-TUC-JAS (D. Ariz.).

### B. The 12-Month Finding and Special Status Assessment

To complete a 12-month finding for a "new start" species—meaning that it will be the Service's first determination whether a species qualifies as endangered or threatened—the Service first completes a Special Status Assessment ("SSA"). The SSA is a rigorous document that provides a single source for a species' biological information. The Service's decision-

makers use this document for all ESA decisions (e.g., listing, consultations, grant allocations, etc.). The Service can conduct an SSA at any time, but ideally conducts it before the candidate assessment or 12-month finding stage. In preparing an SSA, the Service first compiles all the best available information on a species. Next, the SSA describes the species' current habitat and demographic conditions. Finally, the SSA forecasts the species response to probable future scenarios with respect to environmental conditions and conservation efforts. Developing an SSA normally takes at least 12 months but can take longer in more complex cases. For instance, because the lake sturgeon is a "new start" species, the Service estimates that it will take longer than 12 months to conduct an SSA on the lake sturgeon.

Although the SSA does not directly result in a 12-month finding, the Service relies on the SSA to provide its decision-makers with the best available scientific information to evaluate and facilitate ESA choices. The Service also uses the SSA as a biological basis for the Recommendation Team Meeting, where managers from all regions within the species' range meet to review the species' status and determine whether it meets the requirements for threatened or endangered status. If the Service lists a species as threatened or endangered, staff will then draft an appropriate Federal Register notice.

Once the Service starts drafting a notice, it must also consider whether a "critical habitat" designation is appropriate. A critical habitat is a specific area that has biological features essential for a species' conservation and requires special management considerations for protection. 16 U.S.C. §1532(5)(A). Critical habitat designation involves several steps, and the Service must concurrently make this designation with the listing determination "to the maximum extent prudent and determinable." 16 U.S.C. §1533(a)(3)(A). The Service interprets "prudent and

determinable" to mean that it has sufficient information to evaluate the species' needs or the impact of a critical habitat designation. 50 C.F.R. §424.12.

## C. Review of the 12-Month Finding

Once the Service drafts a 12-month finding, it must be reviewed from the staff level to the regional director, by the Regional Solicitor's office, by Branch Chief for Domestic Listing and the Chief of the Division of Conservation and Classification, by the Assistant Director for Ecological Services, and lastly by the Service Director who makes the final decision. After the Service Director, the draft moves to the Assistant Secretary for the Fish and Wildlife and Parks, and then to the Executive Secretary for final clearance before appearing in the Federal Register. At minimum, it takes three months from the time the draft listing arrives at the Branch Chief for Domestic Living's desk to the time the Executive Secretary clears it for publication.

## D. Service Funding

For more than a decade, Congress has included a spending cap on the amount that the Service can spend on petition findings, listing determinations, and designations of critical habitat under the ESA. The spending cap for years 2015 to 2019 were: $20,515,000 for FY 2015; $20,515,000 for FY 2016; $20,476,000 for FY 2017; $18,818,000 for FY 2018; $18,318,000 for FY 2019. On December 20, 2019, the appropriations bill for FY 2020 became law, which included a spending cap of $20,318,000 for the listing budget. The spending cap limits the number of actions the Service can fund during a fiscal year. After receiving funds, the Service allocates some funds to headquarters to support the national listing program and allocates the remainder to the eight regional offices. The Service bases funding to regional offices on the amount required to pay all staff for the time spent working on listing packages, the regional workload percentage each region is responsible for, and the complexity of each region's

packages. The Service allocated Region 3 (which is the lead region for the lake sturgeon finding) $805,139 for staffing and package costs for FY 2020.

### E. The National Listing Workplan

From 2007 to 2010, the Service received petitions to list 1,187 species. Between 2009-2010, WildEarth Guardians and the Center for Biological Diversity filed 20 lawsuits that, like the case here, sought compliance with nearly 800 listing deadlines. The Judicial Panel of Multi-District Litigation eventually consolidated these cases and the parties settled them by two separate agreements. *In re: Endangered Species Act Section 4 Deadline Litigation*, No. 10-mc-00377-EGS (D.D.C.) (documents 31-1 (May 10, 2011) and 42-1 (July 12, 2011)).

In 2016, in response to the volume of petitions it received and status reviews, the Service developed, through notice and comment rulemaking, the "Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings on Petitions for Listing Under the Endangered Species Act[.]" 81 Fed. Reg. 49,248-49,255 (July 27, 2016). The Service uses this methodology to schedule the 12-month findings on the National Listing Workplan (the "Workplan"), which prioritizes the Service's workload based on the needs of candidate and petitioned species.

Under the adopted methodology, the Service assigns each 12-month finding into one of five priority "bins": (1) The species is critically imperiled; (2) strong data is already available about the species' status; (3) new science is underway that would inform key uncertainties about the species' status; (4) conservation efforts are in development or underway and likely to affect the species' status; or (5) the available data on the species is limited. The current Workplan[4] states the Service's planned actions from 2021-2025.

---

[4] The Service attached a copy of the then-current Workplan in its response to Plaintiffs' motion for summary judgment. *See* [23-4]. The Service updated its Workplan in January 2021. The current Workplan is available on the Service's website at https://www.fws.gov/endangered/esa-

From May 14, 2019 to September 15, 2020, the Service completed the following actions: fifty-three not-warranted 12-month listing petition findings, seven proposed listing and critical habitat rules, fifteen proposed critical habitat designations, one final list and critical habitat rule, six final listing determinations, seven final critical habitat determinations, and one not-prudent critical habitation determination.[5]

### F.  Current Workplan Priorities

As of this order, the Workplan contemplates 11 projects ahead of the lake sturgeon's 12-month finding:

1.  The western fanshell 12-month finding (Bin 3);
2.  The Hall's brush 12-month finding (Bin 3);
3.  The little brown bat (Bin 4);
4.  The northern long-eared bat (n/a bin);
5.  The mammoth spring crayfish 12-month finding (Bin 3);
6.  The salamander mussel 12-month finding (Bin 3);
7.  The Blanding's turtle 12-month finding (Bin 3);
8.  The plains spotted skunk 12-month finding (Bin 3);
9.  The streamside salamander 12-month finding (Bin 3);
10. The golden-winged warbler 12-month finding (Bin 3);
11. The monarch butterfly (Bin LPN 8).

Although listed in bin 4, the Service grouped the little brown bat with other bat species, including the northern long-eared bat, which is the subject of the case: *Ctr. for Biological Diversity v. Ashe*, Case No. 15-cv-477-EGS (D.D.C.). In that case, the court remanded the listing

---

library/pdf/National-Listing-Workplan-FY21-FY25.pdf, which accounts for Plaintiffs' lake sturgeon petition.

[5] The Court deems as admitted statements ¶6 and ¶7 of Defendants' statement of material facts. Local Rule 56.1 states that a party disputing an asserted fact "must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules"). Plaintiffs disputed facts ¶6 and ¶7 on the basis that they "are without sufficient knowledge or information to form a belief as to the truth of the allegations and dispute them on that basis." [25-1]. This very clearly falls short of Local Rule 56.1's standard. Therefore, the Court deems these facts admitted.

rule to the Service to make a new rule consistent with the court's determination that the prior listing decision was unlawful. In short, the District Court for the District of Columbia concluded that the Service must make a new listing with respect to the northern long-eared bat within 18 months after it completes its SSA. *Id.* at Dkt. 96 (March 1, 2021). Similarly, the Service must deliver the 12-month finding for the monarch butterfly in accordance with a court-ordered settlement agreement. *Ctr. for Food Safety v. Jewell*, Case No. 16-cv-1008-EGS (D.D.C.). The Service assigned the lake sturgeon 12-month finding to bin 4. The Service also indicates that its current workload for Region 3 includes four stand-alone critical habitat designations and three final listing and critical habitat rules.

## Standard of Review

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). To establish an undisputed material fact, a party "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

## Discussion

The material facts in the cross motions for summary judgment before the Court are undisputed, and the Service acknowledges it did not issue its 12-month finding for the lake sturgeon petition within the allotted time. The only question that remains is what deadline the

Court should impose for the Service to issue its 12-month finding on Plaintiffs' petition. Plaintiff asks the Court to compel the Service to make its 12-month finding on the lake sturgeon petition within twelve months. The Service asks the Court to order it to submit a 12-month finding by June 30, 2024.

To prevail in obtaining injunctive relief, a litigant must show: (1) success on the merits; (2) irreparable harm; (3) that the balance of hardships between the plaintiff and defendant weigh in favor of an injunctive remedy; and (4) that the public interest will not be harmed by the relief requested. *Lacy v. Cook County, Illinois*, 897 F.3d 847, 867 (7th Cir. 2018). The first and second elements are easily met here because the Service acknowledges it violated the statutory deadline, and if the Service had issued its 12-month finding as required then the lake sturgeon would be further along in the process toward potentially obtaining the environmental protections afforded by the ESA. As a result, the only elements the Court need consider are the balance of hardships and public interest factors. Before that, however, the Court addresses the scope of judicial discretion it possesses in crafting an equitable remedy in this case.

## I. Scope of Judicial Discretion

The parties dispute whether the ESA curbs the judicial discretion normally available to a court exercising its equitable powers. Plaintiffs argue that the ESA's statutory deadlines foreclose the traditional balance of hardships analysis, and thus by extension how the Court applies its judicial discretion. The Service, on the other hand, argues that the ESA's statutory deadlines do not bind judicial discretion when crafting an equitable remedy.

The Court finds that the ESA's statutory deadline, by itself, does not constrain judicial discretion when crafting an equitable remedy. As the Supreme Court explains, "[w]here plaintiff and defendant present competing claims of injury, the traditional function of equity has been to

arrive at a nice adjustment and reconciliation between the competing claims." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (internal citations omitted). "'The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.'" *Id.* (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). Indeed, the Seventh Circuit notes that "unless a statute clearly mandates injunctive relief for a particular set of circumstances, the courts are to employ traditional equitable considerations (including irreparable harm) in deciding whether to grant such relief." *Bedrossian v. Northwestern Memorial Hosp.*, 409 F.3d 840, 843 (7th Cir. 2005).

In this case, the ESA does not mandate specific injunctive relief for missed statutory deadlines. Section 1540, which pertains to penalties and enforcement, states, "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be." 16 U.S.C. §1540(g). This section does not, nor any other subsection of §1540, curb a court's discretion when issuing injunctive relief.

Plaintiffs argue that Congress specified the consequences of missing a deadline by enacting a citizen-suit provision under the ESA. But this is not a consequence; it is a method to obtain compliance. The ESA does not tell courts what should occur when the Service misses a nondiscretionary statutory deadline. The Supreme Court recognizes that where Congress has not explicitly guided or controlled the exercise of judicial discretion, the full scope of discretion remains. *Weinberger*, 456 U.S. at 313.

The parties also offer competing ways to interpret the Supreme Court's decision in *TVA v. Hill*, 437 U.S. 153 (1978). To be sure, the Supreme Court in *Hill* stated that Congress had

foreclosed the usual exercise of discretion possessed by a court of equity in that case. Plaintiffs, however, read that case too broadly. In *Hill*, the Supreme Court held that the ESA required the District Court to enjoin the Tellico Dam's completion to preserve the snail darter (a species of perch). *Id.* at 194-95. The Court, however, premised its decision on the fact that the statute's purpose and language, not the bare fact of a statutory violation, compelled that conclusion. *Id.* at 174. The parties conceded in *Hill* that the dam's completion would cause the snail darter to go extinct, and the Supreme Court found that Congress, by giving endangered species the highest of priorities, had chosen the snail over the dam. *Id.* at 194. But the Court acknowledged "that a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.* at 193. It just so happened that in that case—when confronted with the extremes of an endangered species going extinct or completing a multi-million-dollar dam project—the Court concluded that Congress gave species protection the higher priority. Those type of extreme stakes is simply not present here. The Court's discretion, therefore, remains intact.

## II.     Balance of Hardships and Public Interest

Having determined the scope of the Court's discretion, the Court must analyze the balance of hardships and public interest factors. Because the analysis overlaps for these elements, the Court will consider them together. At the heart of the parties' arguments is the role that administrative workloads and budgetary constraints should play in crafting an equitable remedy. Plaintiffs argue that courts routinely reject arguments about administration difficulties, while Defendants argue that courts often consider these kinds of practicalities. The Court finds that the balance of hardships and public interest factors weigh in favor of adopting Defendants' proposed deadline for several reasons.

First, as a matter of practicality, it would be imprudent to set a deadline that the Service cannot feasibly comply with. In fairness, Plaintiffs' proposed deadline is feasible in the strictest sense, but it would require the Service to reorder priorities and shift resources away from other projects and toward the lake sturgeon. Thus, in setting a feasible deadline, the Court will account for those projects that the Service identifies as a more urgent priority.

Second, the Court is well within its discretionary powers to consider administrative workloads and budgetary constraints when crafting an equitable remedy. *See Nat. Res. Def. Council v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975). Here, the Service has demonstrated it has limited funding. For fiscal year 2020, Congress allocated to the Service $20,318,000; $805,139 of which the Service allocated to its Region 3 office, which is handling the 12-month finding for the lake sturgeon petition. Though this may seem a significant amount of money, it represents an overall downward trend since 2015. The Service bases regional funding on several factors including the complexities of the cases assigned to a particular region. Although Plaintiffs argue that the Service does not identify any funding issues specifically related to the lake sturgeon petition, the Court finds it to be self-evident that overall budgetary constraints affect the entire scope of the Service's work.

Third, the Service's proposal best balances the work it must perform for other species. The Service believes it can complete the lake sturgeon's 12-month petition by June 30, 2024. While this date is three years out, the Service determined it needed this amount of time due to the complexities of the lake sturgeon petition and its other existing priorities. The Service categorizes its listing priorities by sorting species into "bins." The Service developed this ranking system through its notice and comment rulemaking authority, just as Congress proscribed in the ESA. The "bin" designation a species receives depends on the Service's evaluation of its priority,

13

with 1 being the highest priority (because the species is critically imperiled) and 5 being the lowest (meaning limited data on the species is available). The Service assigned the lake sturgeon to bin 4, because: (1) conservation efforts are already underway; and (2) in the Service's view, those conservation efforts are likely to address the threats to the species in the interim. The Workplan details 11 other listing-related actions in Region 3 for higher-priority species that the Service would like to complete before the lake sturgeon. Most of these species are assigned bin 3 rankings except for two species: (1) the northern long-eared bat (remanded to the Service by the District Court for the District of Columbia), and (2) the monarch butterfly (the subject of a court-approved settlement agreement). If the Court ordered a 12-month deadline for the lake sturgeon petition, the Service would have to reorder its priorities within Region 3 or reassign the petition to another region. The consequence of either action would be to disrupt the work for other higher-priorities species to make room for the lake sturgeon finding.

Fourth, a 12-month finding requires substantial work and resources. The Service must base a 12-month finding solely on the best scientific and commercially available data after conducting a review that considers those efforts made by a State or foreign nation to protect a species. 16 U.S.C. 1533(b)(1)(A). To accomplish this, the Service coordinates with State and other partners to collect the best scientific data available across the species' range. The Service then evaluates the data to determine the species' current and future condition and incorporates those findings into an SSA. Although this assessment does not directly result in a finding, it is significant because it serves as a biological risk assessment and ensures the Service uses the best scientific information available.

Absent some exigent circumstance, which is not present here, the Court is wary to reorder the Service's list of priorities, especially considering that Congress directed the Secretary to

establish "a ranking system to assist in the identification of species that should receive priority review[,]" 16 U.S.C. §1533(h)(3), which the Service has done through its prioritization methodology. The Service's Workplan does not represent an arbitrary ranking choice. Rather, deciding which petitions and projects to address with the Service's limited resources requires a high level of technical expertise that courts best leave to the Service because those determinations are within its expertise. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). To require otherwise would elevate the lake sturgeon petition above other species, including those that the Service designates as a higher priority from a conservation standpoint. What's more, after considering the complexity of the 90-day finding for the lake sturgeon petition and the species' range (spanning 18 states), the Service originally targeted 2025 to complete the lake sturgeon's 12-month finding. In light of this lawsuit, however, the Service revisited its schedule and now targets 2024 to complete the lake sturgeon's 12-month finding.

The Court is neither bound nor persuaded by the three main cases Plaintiffs cite in support of their argument to reject administrative burdens and priorities: *Butte Environmental Council v. White*, 145 F. Supp. 2d 1180 (E.D. Cal. 2001); *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833 (9th Cir. 2001) (referred to as "*Gila Chub*"); *Ctr. for Biological Diversity v. Norton*, 163 F. Supp. 2d 1297 (D.N.M. 2001) (referred to as "*Checkerspot Butterfly*"). In *Butte*, the Service listed four fair shrimp as endangered species but failed, for six years, to issue critical habitat designations under the ESA. 145 F. Supp. 2d at 1184. But even in that case, the district court considered practical constraints when crafting its injunctive remedy to ensure that it set a feasible deadline. *Id.* In *Gila Chub*, the court never even broached the topic of administrative workloads or priorities because the issue in that case was whether the Service's "candidate status" designation equated to a warranted but precluded finding for purposes of the ESA. 254

15

F.3d at 837-840. And lastly, in *Checkerspot Butterfly*, the court said it was bound by the Tenth Circuit's decision in *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999), that it could not consider the Secretary's budgetary crisis. But again, that case is not binding here nor in unison with more recent decisions addressing analogues circumstances. *See Ctr. For Biological Diversity v. U.S. Fish and Wildlife Service*, Case No. 19-cv-354-TUC-JAS, Dkt. 31 (D. Ariz. Nov. 24, 2020); *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, Case No. 16-cv-06040, 2018 WL 6067546 (N.D. Cal. 2018). Moreover, in that case the Service had already drafted its finding and only needed to supplement the already-drafted 12-month finding and have it reviewed. 163 F. Supp. 2d at 1301. In other words, the Service didn't need to complete all the additional work it claimed it needed, and therefore an extended time period to issue a 12-month finding was not justified. *Id.*

Finally, Plaintiffs argue that the Service could utilize the warranted-but-precluded finding. The Court disagrees. This option would not alleviate the issues identified with respect to budgetary constraints, manpower constraints, or the priority of other species. Even if the Service made a warranted-but-precluded finding for the lake sturgeon, it would still need to compile and analyze the best scientific and commercially available information and prepare an evaluation of the reasons supporting that finding as mandated by the ESA. This would also involve peer reviews of the Service's assessment, a recommendation team meeting, drafting a 12-month finding that incorporates the compiled information, and obtaining management, legal, and departmental reviews. All these actions require substantial time and resources, which again would require the Service to redirect efforts away from other species that it considers a higher priority.

To be clear, this order is not a tacit approval of any projected timeline contemplated by the Service's Workplan. Nonetheless, in this instance, the Court finds that the Service's proposed deadline is reasonable considering the Service's budgetary constraints, manpower constraints, and other competing projects for higher-priority species and court-ordered actions. In sum, the Court finds that the Service's proposal best balances the competing interests at play here and further advances the ESA's overall purpose in protecting endangered or threatened species in need of conservation.

## Conclusion

Deb Haaland, in her official capacity as Secretary of the Interior, is substituted into this case in place of David Bernhardt under Rule 25(d) of the Federal Rules of Civil Procedure. Martha Williams, in her official capacity as Principal Deputy Director of the U.S. Fish and Wildlife Service, is substituted into this case in place of Gary Frazer. The Court grants in part and denies in part Plaintiffs' motion [22]. The Court grants Plaintiffs' motion with respect to liability, but denies the motion with respect to the relief requested. The Court grants in part and denies in part Defendants' motion [24]. The Court grants Defendants' motion as to the relief requested, and denies the motion as to liability. Judgment entered in favor of Plaintiffs. The Court orders Defendants to submit their 12-month finding with respect the Plaintiffs' lake sturgeon petition to the Federal Register by June 30, 2024. Civil case terminated.

**SO ORDERED.**                                  **ENTERED:   September 14, 2021**

_____

**JORGE L. ALONSO**
**United States District Judge**